## RUBSAM CORPORATION v. GENERAL MOTORS CORPORATION et al.

### No. 5589.

District Court, E. D. Michigan, S. D.
April 1, 1935.

Benjamin Kleinstiver, of Jackson, Mich. (F. Townsend Beaman, of Jackson, Mich., of counsel), for plaintiff.

Drury W. Cooper, of New York City, and Bruce G. Booth, of Detroit, Mich. (Clinton Blake Townsend, of New York City, of counsel), for defendants.

TUTTLE, District Judge.

This is a suit in equity based upon alleged infringement of United States letters patent No. 1,601,455, which was applied for on July 27, 1923, by Charles F. Rubsam, and issued on September 28, 1926, to the plaintiff, Rubsam Corporation, as assignee of the applicant. The bill of complaint prays for an injunction restraining infringement and for an accounting of profits and damages. The answer of the defendants attacks the validity of the patent in suit, denies infringement, and sets up the additional defenses of equitable estoppel and laches.

Plaintiff's patent concerns devices for securing demountable rims to wheels. Claim 3, being essentially the same as claims 1 and 2, which are the only other claims relied upon by the plaintiff, reads as follows:

"The combination with a wheel body having a fixed metallic rim and a demountable rim adapted to be secured on the fixed rim, of attaching lugs for the rim and bolts secured in the fixed rim and provided with nuts for laterally forcing the lugs into operative position, the fixed rim and inner ends of the lugs having complementary seats formed to hold the lugs to support the demountable rim radially and for lateral engagement with each other, the outer ends of the lugs and the demountable rim at one of its sides being provided with complementary seats shaped so the lugs will support the demountable rim radially and for engagement to apply lateral pressure to the demountable rim, all of said seats being shaped to permit the lugs to rock laterally and move radially relatively to the rims under control of the seats on the rims while the nuts are being tightened, and so the lugs will be positioned by the complementary seats, the lugs having cylindrically convex faces engaged by the nuts to permit the lugs to rock relatively to the nuts."

It appears from the testimony that from 1922 until 1928 there was a close relationship between plaintiff and the Jaxon Steel Products plant of the defendants with respect to the development and production of rim clamps. The plaintiff purchased its requirements from the Jaxon plant of the defendants, and these requirements constituted about 1 per cent. of the Jaxon production. Charles F. Rubsam, who was the president and with his wife the chief stockholder of the plaintiff corporation, and who is also the patentee of the patent in suit, made it a practice to visit the Jaxon plant of the defendants two or three times a week to make personal inspections of the work being done for the plaintiff. It is apparent that since 1922 plaintiff and its predecessors have been familiar with the rim clamp marketed by the defendants. In 1923 the parties to this suit entered into a written license agreement concerning Rubsam patent, No. 1,395,362,

pertaining to wheels and rims. In September, 1928, the plaintiff commenced equity suit No. 2907 [57 F.(2d) 581] in this court, upon other patents than the one here in suit, against the defendants in the instant case, alleging infringement of four patents including No. 1,395,362 of the agreement and relating to wheel and rim construction, and which patents were finally declared invalid by the Court of Appeals of this circuit. General Motors Corporation v. Rubsam Corporation, 65 F.(2d) 217 (C. C. A. 6). Several of the exhibits in the instant case were exhibits in the 1928 suit. Defendants discontinued use of demountable rims and rim clamps in the production of automobiles and trucks in 1930. This suit was commenced on October 13, 1932.

The defendants maintain that the foregoing facts establish adequate defenses of equitable estoppel and laches, but in view of my decision to base my opinion solely on the issue of infringement, it is unnecessary to pass upon these questions.

As soon as the demountable rim came into the automobile wheel art, clamps were a necessary part of the combination of the wheel with its felloe and the separable or demountable rim, so that the latter with an inflated tire mounted thereon could be changed by a user on the open road.

Many forms of lugs, wedges and/or clamps have been introduced in this present suit, both in prior patents and in actual constructions.

One of the earliest was used on the old Baker wheel, Plaintiff's Exhibit 6, and yet another form was used on Baker wheel, Defendants' Exhibit 178. The first of these wheels was made and used in great quantities over a period of several years prior to any alleged date for the patent in suit. It has the earlier form of wedge clamp fitted between the metal band of the wooden felloe and the demountable rim, and forcing the rim outwardly and also back on the flared inner side of the metal band of the felloe.

The record shows the second Baker wheel was built and demonstrated to several automobile companies, but did not go into extensive use. It has a step plate secured to the outer side face of the felloe, upon which the lower end of a clamp rests, while the upper end is drawn inwardly by the bolt and nut to exert lateral pressure on the outer side of the rim, to force it upward and backward on the flared rear side of the felloe band.

It has also been shown that great quantities of wheels were used wherein lugs were attached permanently to the rim and projected across and were pulled toward the outer face of the felloe by bolts and nuts, proving that a lateral pressure was sufficient so long as the rim was firmly held to its seat on the flared rear flange of the felloe.

Now, out of this process of clamping and wedging there grew clamps with wedges of various forms, but whatever the shape of the wedge and clamp, it was desirable to elongate the bolthole so that the bolt had room to permit the clamp to move and tilt without bending the bolt.

Now, too, along with the tilting of the clamp, it was early found necessary not only to elongate the hole through the clamp, but also to make the surface of the clamp against which the nut pressed, that is, the outer face, convex so that in any position of the clamp the flat inner face of the nut would contact with the convex outer face of the clamp on a line passing squarely across the center of both the bolt and the nut, and it is clear to see that this arrangement was desirable and would prevent any strain on the bolt that would tend to bend it. Some even made the outer face of the clamp concave, but we find that construction more isolated and not so desirable.

Therefore, we have it old to use a comparatively flat wedge between the felloe and the rim as shown on the Baker wheel, with a long clamp or tail extending down the side of the felloe. We have it old to use a blunter wedge between the felloe and rim with a clamp portion extending down the side of the felloe, and an outer convex face and an elongated hole. (Hargraves patent, No. 1,258,676, by the record owned by defendants.) We also have it old in the Empire Tire Company clamp illustrated in "The Automobile" of 1910, and testified to as used commercially in considerable numbers, to support the clamp at the bottom on a ledge plate secured to the outer face of the felloe and with the top formed with a seat, a wedge seat if you will, to contact with the outer side of the demountable rim. We go to the Baker patent, No. 1,314,932, and we find a clamp supported at the bottom as the Empire clamp was supported, and with the top bearing against the flat outer side of the rim, so as to give no wedging action.

Now we come to the metal felloe formed by rolling a band of metal into a trough-shaped cross-section with a front leg and a

base and a rear leg with its top or outer part flared, just as the metal bands on the old wood felloes were flared to form a back seat for the demountable rims; and we find this construction shown in early patents and used commercially, for instance, in the Atlas wheel as early as 1918 and sold for replacement wheels for Ford cars, and we see from the demonstration of taking the rim off the wheel, Defendants' Exhibit 164, that it was desirable to make the front leg of the felloe fit pretty close to the rim, so that little space was left for a clamp or wedge, and also the metal at the top of the front leg might bend under the pressure of a clamp or wedge; consequently the manufacturer pierced holes in the front leg at the bottom and a clamp was formed with prongs to enter the slits as an anchorage or leverage point, and the upper end formed a wedge seat for the outer side of the rim. This was the Atlas structure, and is typified in the Jobski patent, No. 1,402,511, under which the record shows defendants were licensed.

As this clamp or wedge developed it became less important as to just what shape the top part of it was, and the top became separate from the bottom, so that the two parts, the prongs at the lower end and the rim seat at the upper end, did not look like what we ordinarily think of as a wedge. But it had the very same action as it was pushed in; there was the pressing up at the top and there was the pressing down at the bottom, resulting in pushing apart, and as the felloe was unyielding the rim was the yielding part that moved until it became seated in its proper position on the rear felloe flange. In each case we find the combination of the wedging action and the clamping action, and a clear line of growth from the wedge part carried entirely at the top of the clamp to the wedge being divided with part at the top and part farther down on the clamp, and the lower part of the wedge as it was pressed in raised the wedge and the rim with it, to the extent the bottom part of the fingers or wedge section was sloped.

The first wedges may have had too much direct radial action, but such cannot be said about the wedge clamps of the Atlas or Jobski type, and so we find growing right in between these types the Schmidt form (patent No. 1,655,165), wherein he chose to have the openings for the wedge fingers made alongside the bolthole, so that one punch would do instead of one for the bolthole and two smaller ones for the fingers. This

construction was evidently found satisfactory, as it went into extensive use, and it gave sufficient radial wedging movement to the top and a lateral movement like all the other clamps.

Now, having in mind that the actual placing of the rim on the back-flared flange of the felloe is always done by the top and tip of the clamp, we get more of a radial swing of the clamp by putting the pivot and finger down in a slot in the side of the hollow metal felloe; and really we get two things that may give both radial and lateral movement to the top rim seat of the clamp: We get whatever wedge action there is because of the slope of the under side of the tooth as it is crowded in across the rigid part, that is, the felloe, and also movement due to the top tilting on a curve as it is drawn in by the fastening nut. In other words, the swing inward of all these clamps at the top gives a combined radial and lateral movement until it is perpendicular. The Schmidt patent is not before me to decide whether it is valid or not, but I may say he did very little, if anything, over what had been well understood in the art. It is true Schmidt is the first to support the wedge tongues of his clamp at the bolthole where he could exert direct pressure on them by the nut as it was tightened up, and he later formed his bolt with a special stop on the inside of the felloe to take the wedge pressure without bending the felloe. This, however, is the only contribution Schmidt could have made because it was old in all these combination clamp wedges to move the rim with a backward and upward movement to its seat on the rear-flared felloe flange.

Schmidt grew in the way I have told about, and his was a natural growth in this art. You can trace the history of it through the crowded art while men were doing the natural development from the old wood felloe mounting with the wedge between the top or metal band of the felloe and the rim, or a support plate fastened on the side of the felloe to the holes pierced in the side of the hollow metal felloe to form a ledge or toehold for the clamp or wedge. This grew into Schmidt just as naturally as you would trace one's ancestry back several generations.

Now, Mott (patent No. 1,403,439) starts with an existence all his own, without any line of ancestry. He evidently conceived the idea of shaping his hollow metal felloe with a special bulge at the bottom of the outer leg, and used a clamp that had a slight

underhook around the bulge, and at its outer end had a slight overhook on the curved outer side of a clincher (inturned) rim. But this was evidently not the right thing for a straight-side (outturned) rim, so the top overhook had to be cut off, and Rubsam naturally grows from Mott by taking the Mott clamp and grinding off the hooked ends and using the well-known elongated hole for the bolt and convex outer face for the nut, so that the clamp could swing naturally inward, laterally and also as it swung inward and approached the perpendicular, it swung on a radius upwardly, and effectively seated the rim on the back felloe flange, just as all the others had found it necessary to do, but with a little different combination.

That is to say, Rubsam grew from Mott just as plainly as Schmidt grew from the other old line. And what Rubsam did was, instead of having the ends of the clamp snugly fit the curves on the bulge of the felloe and the outerside of the rim, and overreach the curves to tend to hold the rim and felloe together, he just straightened out the ends and made the seats larger, so that they would form a brace or prop between the bulge at the lower end of the felloe and the rim.

Rubsam formed curved "complementary" seats between the outer end of his clamp and the rim, and between the inner end of his clamp and the felloe bulge. He used the curve of the bulge to slide his clamp around as it was swung to tight clamping position by the nut, and in this case I am not going to pass upon the extent of the ingenuity of doing that, or whether Rubsam was the first to do it; in other words, I will accept the presumption of validity that goes with the patent for the sake of this lawsuit, because, as I have before stated, I am going to dispose of it on the question of infringement.

I do need, however, to interpret the claims of the Rubsam patent here in suit in order to determine what scope should be given the wording of them, and I find that however he may have worded them, it would have been very unfair for Rubsam, growing as his patent did, and evidently developed from Mott, to reach over into the older field and get the benefit of any combination of radial and lateral movement for forcing the rim to its place on the rear felloe flange.

Rubsam admittedly did not invent the convex seat for the nut. He did not invent the elongated hole for the bolt to permit a clamp to swing and accommodate itself to position. He did not invent that lifting which comes from the wedging action of crowding a thing that is tapered or tilted between a rigid felloe and a movable rim. He did not invent the lifting which comes from the top of the clamp as it is swung through a curve on some other portion of the clamp as a pivot. So if this patent, this growth from Mott, were to be construed to reach back into the older field, or to cover what grew so naturally from the older field, then the patent would be void. But I am rather inclined, for the purpose of this lawsuit, to limit the Rubsam patent so that it does not apply to Schmidt or the alleged infringing articles here in suit and claimed to be made under the Schmidt patent, and I think it would be a waste of my time to study the record in an effort to determine whether Schmidt developed a few days later or a few days earlier than Rubsam. They did not grow alike, and, while they are in the same art, they may well be likened to two trees that grew in the same orchard but bore different varieties of fruit. They do not look alike; they did not grow alike. Rubsam grew directly from Mott; Schmidt grew from the old natural stock that the pioneers planted.

Both Schmidt and Rubsam, to be held valid patents, must be held to exactly what they show. They cannot cover much more than their shape. They were both too late in a crowded art to get any broad patent.

In reviewing the claims I need only take claim 3, for example, as typical of claims 1, 2, and 3 of Rubsam patent, No. 1,601,455, here in suit, and I have "the combination with a wheel body having a fixed metallic rim and a demountable rim adapted to be secured on the fixed rim."

We all agree that those are essential elements to any of the wheels we have been talking about. Likewise, "of attaching lugs for the rim and bolts secured in the fixed rim and provided with nuts for laterally forcing the lugs into operative position," we find to be old essentials to the combination of fixed felloe and demountable rim we are talking about.

Now, the next requirement we come to is "the fixed rim and inner ends of the lugs having complementary seats formed to hold the lugs to support the demountable rim radially, and for lateral engagement with each other."

The defendants do not have this element, and Schmidt does not have it unless we give it a broad construction, and then it is as old as the art itself.

I think it fair to save the Rubsam patent by saying that it is something different from the old devices and different from Schmidt and defendants' devices, by finding it limited to the rounded or arc-shaped lower end of the clamp referred to in the claim as a "lug" and the "complementary" seat formed by the specially formed bulge on the felloe.

The claim continues with:

"The outer ends of the lugs and the demountable rim at one of its sides being provided with complementary seats shaped so the lugs will support the demountable rim radially and for engagement to apply lateral pressure to the demountable rim."

Surely this is what all the lugs, wedges, and clamps of the prior art did, both in patents and those that were used and not patented. In like manner the remainder of the claim either describes parts and functions well known in the art long prior to Rubsam, or must be limited to the exact arrangement of bulged felloe flange and the clamp with a complementary seat. It reads as follows:

"All of the said seats being shaped to permit the lugs to rock laterally and move radially relatively to the rims under control of the seats on the rims while the nuts are being tightened and so the lugs will be positioned by the complementary seats, the lugs having cylindrical convex faces engaged by the nuts to permit the lugs to rock relatively to the nuts."

Were I to construe this claim and give it a broad interpretation, and then by equivalents say that these defendants infringe, by the same token, the same line of thought that would lead me to that conclusion would lead me to what was well known in the art long prior to Rubsam, and the claims would be void.

I give these claims the presumption of validity that they come to me with, and interpret them so that they do not include the prior art, and, when I do that, the defendants do not infringe.

The result is a decree in favor of the defendants, dismissing the bill, with costs to be taxed.

Upon authority of Briggs v. United States, 45 F.(2d) 479, 480 (C. C. A. 6); Lewys v. O'Neill (D. C.) 49 F.(2d) 603, 618; Hazeltine Corporation v. Radio Corporation (D. C.) 52 F.(2d) 504, my opinion may stand as the findings of fact and conclusions of law under Equity Rule 70½ of the Supreme Court (28 USCA following section 723).